# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA ARMSTRONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:12cv0507 JAR |
| | ) | TCM |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Barbara Armstrong for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI), under Title XVI of the Act, 42 U.S.C. § 1381-1383b. Ms. Armstrong has filed an opening brief and a reply brief in support of her complaint; the Commissioner has filed a brief in support of her answer.

The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is hereby substituted for Michael J. Astrue as defendant. See 42 U.S.C. § 405(g).

**Procedural History**

Barbara Armstrong (Plaintiff) applied for DIB and SSI in August 2009, alleging she had become disabled on August 11, 2009, by heart attacks, a stent in her heart, clogged arteries, a back injury, high blood pressure, high cholesterol, depression and anxiety attacks, insomnia, inflammation in both knees, chest pains, shortness of breath, acid reflux disease, a stroke at age nine, numbness in her arms, and pain and arthritis in her neck, shoulders, and spine. (R.[2] at 102-12, 128.) Her applications were denied initially and following a hearing held in September 2010 before Administrative Law Judge (ALJ) Paul W. Schwarz. (Id. at 10-22, 27-52.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

**Testimony Before the ALJ**

Plaintiff, represented by counsel; Herman Litt; and Dr. Albert Oguejiofor, testified.

Plaintiff, fifty-three years old at the time of the hearing, testified that her worst medical problem was depression. (Id. at 30-31.) Every day, she is depressed and has to force herself to get out of bed, bathe, and do anything. (Id. at 31.) She has been depressed her whole life, and has gotten to the point where she can no longer force herself to go to work. (Id.) She has low energy and is lethargic. (Id.) She has not been seeing a counselor; however, she is now receiving Medicaid and would begin. (Id.) The Prozac she is taking has no effect. (Id.) The dosage was last adjusted four months earlier. (Id. at 37.) Her

_____

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

- 2 -

depression is alleviated by seeing her grand-daughter and aggravated by stress, e.g., having a flat tire. (Id. at 32.) She also suffers from panic attacks a couple of times a week. (Id.) When these occur, she starts having chest pains and thinks she is going to have a heart attack. (Id.) She last had a heart attack in January 2001. (Id.) The one before that was in April 1988. (Id.) She has constant back pain that is a ten on a ten-point scale if she does not take medication. (Id. at 33.) She takes Percocet, which does not entirely relieve the pain but does make it bearable. (Id.)

Plaintiff further testified that she cannot sit or stand for longer than an hour without having to change positions to relieve the discomfort. (Id. at 34.) She spends her day lying down. (Id.) If she were working, she would have to recline every ninety minutes for at least sixty minutes. (Id. at 35.) Because of the pain in her knees, she cannot walk farther than one city block. (Id.) She also has problems with shortness of breath and with insomnia that prevents her from sleeping longer than four hours a night. (Id. at 36.) Plaintiff cannot lift and carry anything heavier than twenty pounds. (Id. at 37.)

Plaintiff last worked on August 11, 2009. (Id. at 36.) She was then "doing night watch" and working in a lock-down unit for girls. (Id.) This sometimes required that she physically restrain residents who became aggressive or posed a danger to themselves. (Id.)

Dr. Oguejiofor testified as a medical expert. (Id. at 38-40.) He agreed with Ms. Dunlap's residual functional capacity (RFC) assessment, see pages 16 to 17, infra, that Plaintiff could occasionally lift twenty pounds, frequently lift or carry ten pounds, and stand and walk for a total of six hours in an eight-hour day. (Id. at 39-40.) Based on his review

- 3 -

of her medical records, he did not agree with a May 2010 assessment finding Plaintiff had a more restrictive RFC.  (Id. at 40.)

Mr. Litt testified as a vocational expert (VE).  (Id. at 41-43.)  He was asked by the ALJ to assume a hypothetical claimant fifty-three years old, who had completed high school, and had the RFC for light work with the additional limitation that she work in a low-stress environment.  (Id. at 41.)  He testified that this claimant could not perform Plaintiff's past relevant work, but could perform such light, unskilled work as office cleaner and mail clerk. (Id. at 42.)  If, however, this claimant had to lie down for fifteen to twenty minutes approximately every hour to hour and a half, these jobs would not be available.  (Id. at 43.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and various assessments of her physical or mental capabilities.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 127-36.)  She was 5 feet 5 inches tall and weighed 180 pounds.  (Id. at 127.)  Her impairments, see page two, supra, limit her ability to work by causing her "trouble grabbling with residents when they get violent" and by preventing her from being able to stand for long periods of time.  (Id. at 128.)  These impairments first bothered her in 2007 and prevented her from working on August 11, 2009.  (Id.)  She stopped working because she "was let go for saying derogatory remarks about the president of the company."  (Id.)  Her medications are all

prescribed by Dr. Rachelle Gorrell and include Crestor,[3] Flexeril,[4]lisinopril,[5] Percocet,[6] Prozac,[7] Synthroid,[8] Xanax,[9] and Zetia.[10] (Id. at 134.) None have any side effects. (Id.)

Asked to describe on a Function Report what she does during the day, Plaintiff reported that she recently lost her job. (Id. at 153-60.) Currently, after waking up, she showers, dresses, does light housework, shops for groceries if necessary, takes out the trash, does dishes, washes her laundry, cares for her two cats, helps her daughter care for her pets, cooks her meals, checks her mail, visits with her four-year old granddaughter, watches some television, and goes to bed. (Id. at 153.) She lives in a house with her daughter. (Id.) She cannot stand or walk for any length of time, kneel, lift anything heavier than twenty pounds, or ride or drive in a car for longer than an hour. (Id. at 154.) She has problems using zippers and buttons and has to take showers because she cannot get out of a tub. (Id.) She prepares her own meals, usually light ones. (Id.) She cannot mow the yard because she gets

_____

[3]Crestor is prescribed for the treatment of hyperlipidemia. Physicians' Desk Reference, 729 (65th ed. 2011) (PDR).

[4]Flexeril (cyclobenzaprine) is a muscle relaxant. Flexeril, http://www.drugs.com/search.php?searchterm=flexeril (last visited May 14, 2013).

[5]Lisinopril is prescribed for the treatment of hypertension. See PDR at 2241, 2242.

[6]Percocet is a combination of oxycodone and acetaminophen. PDR at1096.

[7]Prozac is prescribed for the treatment of major depressive disorder. PDR at 1816.

[8]Synthroid is for the replacement or supplemental therapy for hypothyroidism. See PDR at 543.

[9]Xanax is a benzodiazeprine used to treat anxiety and panic disorders. Xanax, http://www.drugs.com/search.php?searchterm=xanax (last visited May 14, 2013).

[10]Zetia also is prescribed for the treatment of hyperlipidemia. PDR at 2351.

overheated, becomes short of breath, and has chest pains. (Id. at 155.) Because of her heart attacks, she cannot be out in extreme cold or heat. (Id. at 156.) She shops two to three days a week for groceries, cleaning products, and personal hygiene items. (Id.) Each trip is less than an hour. (Id.) Because of the pain in her arms, back, neck, and chest, she rarely engages in her hobbies of sewing and crafting. (Id. at 157.) And, she tires easily during family activities. (Id.) She goes to restaurants and homes of friends and family. (Id.) Her impairments adversely affect her abilities to lift, squat, bend, stand, reach, walk, kneel, climb stairs, complete tasks, and use her hands. (Id. at 158.) She can walk for thirty to sixty minutes as long as it is not too hot or cold. (Id.) She has no problem following written or spoken instructions. (Id.) She has no problem getting along with authority figures, and has never been fired or laid-off because of problems getting along with other people. (Id. at 159.) She does not handle stress well; it causes chest pain, insomnia, and an increase in blood pressure. (Id.)

Plaintiff's son completed a Function Report on her behalf. (Id. at 145-52.) His descriptions of her limitations and abilities were similar to hers. (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications. (Id. at 167-75.) As of approximately December 2009, her depression, stress, muscle tension, headaches, anxiety, pain, and insomnia were all worse. (Id. at 168.) Her knees hurt so badly that she needed assistance standing up if she was on the floor. (Id.) She had been having short-tem memory loss, crying spells, and weight gain. (Id.) Her hair was falling out. (Id.) She was having constant muscle spasms. (Id. at 173.) On another

Disability Report – Appeal form, Plaintiff reported that, beginning in October 2010, she developed a bad cough and urinary incontinence, and the pain in her back, neck, and shoulders worsened. (Id. at 179-86.) Also, her depression and anxiety were worse. (Id. at 179, 180, 185) She had more frequent and stronger chest pains. (Id. at 184.)

Plaintiff had reportable earnings in 1996 through 2008. (Id. at 113.) Her last four years of earnings exceeded $20,000 each year. (Id.)

The medical records before the ALJ are summarized below in chronological order and begin in January 2001 when Plaintiff was transferred from the Phelps County Regional Medical Center (Phelps County) to Barnes Jewish Hospital (BJH) because of chest pain that had begun the day before. (Id. at 353-435.) She was diagnosed with a myocardial infarction and underwent a percutaneous transluminal coronary angioplasty with placement of a stent in her right coronary artery. (Id. at 359.) It was noted that she had a forty-pack-a-year smoking history. (Id. at 357.) Her past medical history also included chronic neck pain, which she "state[d] . . . she had [had] all her life." (Id.) Another notation in the record reads that the past medical history of chronic neck pain was thought by Plaintiff to be a "'pinched nerve,'" for which she took Soma, a muscle relaxer.[11] (Id. at 360.) She was discharged three days later with diagnoses of inferior myocardial infarction, hypertension, and hyperlipidemia. (Id. at 357.)

_____

[11] See Soma, http://www.drugs.com/search.php?searchterm=soma (last visited May 23, 2013). Soma was listed as a current medication on admission; however, there is no prior record of Plaintiff being prescribed Soma.

The following month, Plaintiff was again admitted to BJH with complaints of irritable chest pain. (Id. at 279-352.) After a cardiac catheterization, computed tomography (CT) scan of her chest, and echocardiograph were performed, a myocardial infarction was ruled out. (Id. at 281, 295-98.) She was found to have a normal right ventricular and left ventricular size and function, mild adenopathy, apical hypokinesis (diminished or slow movement), and mild coronary artery disease. (Id. at 331.) There was no aneurysm or pulmonary embolus. (Id. at 281, 331.) The chest pain was thought to "probably [be] of gastrointestinal origin or musculoskeletal in origin." (Id. at 281.) Her past medical history included chronic neck pain. (Id.) Her medications on admission did not include Soma. (Id.) She was discharged with a medication for heartburn relief. (Id.) It was noted that she had smoked two to three packs of cigarettes a day for twenty-five years, but had quit three years earlier. (Id.)

A January 2005 x-ray of her cervical spine revealed degenerative changes, described as having worsened since October 12, 2002.[12] (Id. at 474.)

An April 2006 cardiac catherization performed by Robert B. Lehman, M.D., revealed a "very large, dominant right coronary artery" with patent intracoronary stent "that has, at most, 40% diffuse in-stent restenosis"; "very small left circulation"; and left ventricle systolic function with an ejection fraction of fifty-five percent. (Id. at 211-14.) Dr. Lehman recommended medical management and aggressive risk factor modification. (Id. at 211.)

---

[12]No October 2002 x-ray reports are in the record.

On March 25, 2007, Plaintiff went to the emergency room at Phelps County for treatment of a headache that had begun the day before. (Id. at 472-73.) A CT scan of her brain was negative. (Id. at 473.) Five days later, she had a myocardial perfusion imaging and stress test at Phelps County. (Id. at 467-71.) Both were normal. (Id. at 467, 469.)

Plaintiff was admitted to Phelps County in June after being seen by Rachelle Gorrell, D.O., in her office for complaints of feeling dizzy. (Id. at 449-66.) On examination, Plaintiff was found to have low blood pressure secondary to dehydration and heat exhaustion and acute renal failure due to the low blood pressure and dehydration. (Id. at 456.) Past medical history included two myocardial infarctions, hypothyroidism, status post hysterectomy for cervical cancer, migraines, back injury with chronic back pain and degenerative osteoarthritis, gastroesophageal reflux disease, and anxiety/depression. (Id. at 449.) On examination, she had a good range of motion in her extremities, although "[s]he was generally weak," and had some stiffness and tenderness to palpation in her lumbar spine. (Id. at 450.) Two days later, after treatment, including the administration of intravenous fluids, and tests, including x-rays and an echocardiograph, Plaintiff was released in stable condition. (Id. at 456-66.)

On March 13, 2008, Plaintiff returned to the emergency room at Phelps County, complaining of episodic chest pain that had begun several weeks earlier. (Id. at 440-48.) "[T]he episodes came on with rest or exertion[,]" but were not accompanied by shortness of breath. (Id. at 440.) She reported that she had been under a lot of stress. (Id.) Three electrocardiograms were given at regular intervals; each was within normal limits. (Id. at

444-46.)  Plaintiff was discharged with prescriptions for her regular medications.  (<u>Id.</u> at 442.)

Plaintiff consulted Dr. Gorrell in September 2008 for flu-like symptoms, thyroid issues (e.g., weight gain, dry scalp, and sinus pressure), and constipation.  (<u>Id.</u> at 193-94.)  Her diagnoses included acute sinusitis, hypothyroidism, and anxiety.  (<u>Id.</u> at 194.)  On the checklist-format of Dr. Gorrell's treatment notes, "anxiety" was circled in the list of psychological symptoms.  (<u>Id.</u> at 193.)  She was continued on Xanax and released to return to work the next day.  (<u>Id.</u>)

In February 2009, Plaintiff saw Dr. Gorrell about a cough she had had for the past week, reporting that each episode lasted approximately an hour and ended with vomiting or urinary incontinence.  (<u>Id.</u> at 191-92, 239, 276-77.)  She also had bilateral ear pain, worse in the right than in the left.  (<u>Id.</u> at 191.)  She was prescribed Veramyst (for allergic rhinitis) and Ventolin (for bronchospasms), and was released to return to work the next day.  (<u>Id.</u> at 192.)

In June, Plaintiff had a cardiac consultation with Dr. Lehman.  (<u>Id.</u>)  He noted that Plaintiff "continued to smoke in spite of repeated warnings."  (<u>Id.</u> at 209-10.)  She smoked one pack of cigarettes a day, and had done so for thirty years.  (<u>Id.</u> at 209.)  Both parents had died of lung cancer.  (<u>Id.</u>)  On examination, she was short of breath, had hypercholesterolemia and hypothyroidism, was depressed, and had chronic diffuse aches and pains, greater on the right than on the left.  (<u>Id.</u> at 210.)  An angiography was performed two days later, revealing a "[m]ild functional lower extremity perfusion deficit in the right lower extremity at rest with minimal decompensation with exercise" and "[m]ild to at most

moderate functional lower extremity arterial perfusion deficit in the left lower extremity at rest with no significant decompensation with exercise." (Id. at 195, 265.) An electrocardiograph showed no evidence of active disease. (Id. at 200-01.) A cardiac catheterization revealed an approximately forty percent diffuse in-stent restenosis; sixty percent lesion in proximal diagonal branch; forty percent lesions in proximal left anterior descending; systolic hypertension; and elevated left ventricular end-diastolic pressure. (Id. at 206-07.) Dr. Lehman recommended continued and aggressive risk modification and medical management for coronary artery disease. (Id. at 206.) He also recommended that Dr. Gorrell consider other etiologies for Plaintiff's chest discomfort. (Id.)

On August 14, Plaintiff reported to Dr. Gorrell that her anxiety attacks and back pain were worse. (Id. at 189-90, 238, 274-75.) Because of bilateral knee pain, her legs "buckle[d] out from under [her]." (Id. at 189.) She had been fired from her job of at least ten years and was trying to get on disability. (Id.) She was taking Xanax regularly. (Id.) She was anxious, depressed, and not sleeping well. (Id.) Dr. Gorrell diagnosed anxiety, depression, bilateral knee pain secondary to osteoarthritis, and coronary artery disease. (Id. at 190.) She prescribed Prozac, an anti-inflammatory, Synthroid, and knee exercises. (Id.)

Plaintiff next sought medical attention when she saw Dr. Gorrell in January 2010 for an "overall checkup." (Id. at 272-73.) Her current complaints were of back pain, hypertension, hyperlipidemia, depression, and anxiety. (Id. at 272.) Prozac was not working. (Id.) She was sleeping only two to three hours a night. (Id.) Her stress and pain levels were high. (Id.) Her dosage of Prozac was doubled to forty milligrams, and she was prescribed

Ambien for her insomnia.  (Id. at 273.)  Included with the notations about her prescriptions are two words:  "disability paperwork."  (Id.)

In April, Plaintiff went to the emergency room at Phelps County with complaints of abdominal pain and diarrhea after eating a ham salad sandwich.  (Id. at 437-39.)  X-rays of her abdomen were unremarkable.  (Id. at 439.)  She was treated and discharged in three hours.  (Id. at 437-38.)

In May, Plaintiff requested that Dr. Gorrell complete paperwork for Plaintiff's appeal from the initial denial of her DIB and SSI applications.  (Id. at 270-71.)  She was under more stress than usual, and had an increase in panic attacks.  (Id. at 270.)  She reported that she could not work due to depression and pain.  (Id.)  She complained of being unable to sit or stand for very long.  (Id.)  She was to take two forty-milligram dosages of Prozac twice a day. (Id. at 271.)

Also before the ALJ were various assessments of the causes of Plaintiff's impairments and their resulting limitations.

In October 2009, Plaintiff had a psychological evaluation by Thomas J. Spencer, Psy.D.  (Id. at 232-35, 478-81.)  Her chief complaints were of losing her job – she had been fired after complaining about mistreatment of the children and about sexual harassment by the organization's president – and of a heart condition.  (Id. at 232.)  Also, she had chronic back and neck pain.  (Id.)  She had been sent to see a psychologist after her caseworker thought she looked depressed.  (Id.)  Her mood was worse during the winter.  (Id.) Regardless, she did "the things she need[ed] to."  (Id.)  She did not think she was "necessarily

depressed more often than not." (Id.) She occasionally felt hopeless, helpless, and worthless. (Id.) Sometimes, she lacked energy and motivation. (Id.) She slept a few hours at most before being wakened by pain. (Id.) Her daily activities included caring for her cats, doing the housework and laundry while her daughter worked, and, with her daughter, preparing meals. (Id. at 233.) She enjoyed sewing and embroidery. (Id.) She had good eye contact and was cooperative. (Id. at 233-34.) She did not appear to be in physical distress. (Id. at 234.) Her flow of thought was intact and organized; her insight and judgment were intact. (Id.) There were no delusions or hallucinations. (Id.) Dr. Spencer diagnosed Plaintiff with adjustment disorder, depression/anxiety, chronic. (Id. at 235.) He assessed her current Global Assessment of Functioning (GAF) as 55 to 60.[13] (Id.) He opined that she had a mental illness; however, the illness did not "in and of itself . . . interfere with her ability to engage in employment suitable to her age, training, experience, and/or education." (Id.) He noted that her primary concern was her physical health. (Id.)

The following month, Plaintiff was evaluated by Kevin W. Brewer, D.O. (Id. at 215-17, 219-23.) He listed her problems as ischemic heart disease, arms that go numb, and pain in her neck, back, and right shoulder. (Id. at 215.) She reported that she could not walk farther than 100 yards without becoming short of breath and that she had a decreased range

---

[13]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

of motion in her neck.  (Id.)  She stated that her neck and back pain were constant and increased by any activity.  (Id. at 216.)  She could lift five pounds, but not twenty.  (Id.)  On examination, she had a normal range of motion in her shoulders and lumbar spine.  (Id. at 215, 219-20.)  She had a restricted range of motion in her cervical spine and was able to laterally flex only to fifteen degrees, forward bend and extend to thirty, and rotate to forty. (Id. at 215, 220.)  Straight leg raises were negative[14]; a Babinski sign was absent.[15]  (Id. at 217, 220.)  The muscle strength was good in her upper and lower extremities; there were no muscle spasms or sensory or motor defects.  (Id. at 216.)  She had normal fine motor control, normal sharp/dull discrimination in her lower extremities, and a normal gait.  (Id. at 216, 217.)  She was fatigued and had difficulty sleeping.  (Id. at 216.)  She had a history of anxiety and depression.  (Id.)  Former medications had not helped.  (Id.)  Recently, she had been prescribed Prozac.  (Id.)  Her other medications included Xanax, Endocet,[16] Coreg,[17] Flexeril, Synthroid, Prilosec, Zetia, Crestor, lisinopril, and aspirin.  (Id.)  She smoked one pack of cigarettes a day.  (Id. at 217.)  She was awake, alert, and oriented to time, place, and person.

---

[14]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

[15]A Babinski sign is present if the big toe goes up when the sole of the foot is stimulated. Definition of Babinski sign, http://www.medterms.com/script/main/art.asp?articlekey=7186 (last visited May 14, 2013).  A present sign indicates a problem in the central nervous system.  Id.

[16]Endocet, a combination of acetaminophen and oxycodone, is prescribed for the relieve of moderate to severe pain.  Endocet, http://www.drugs.com/search.php?searchterm=endocet (last visited May 14, 2013).

[17]Coreg is prescribed for hypertension.  PDR at 1327.

(Id.)  Dr. Brewer's diagnoses were coronary artery disease with stable angina pectoris; chronic neck, back, and right shoulder pain consistent with osteoarthritis; hypertension; and hyperlipidemia.  (Id.)

The following month, Plaintiff returned to Dr. Brewer for an evaluation of the range of motion in her right shoulder.  (Id. at 218.)  She reported having pain in that shoulder, which would not touch the bed when she lay flat.  (Id.)  Testing found "no obvious deformity."  (Id.)  She had a normal range of motion in the shoulder and the elbow.  (Id.)  She had a normal grip strength.  (Id.)  Because of her size – Plaintiff had weighed 198 pounds at the first examination – flexion of the knee and hip were slightly restricted.  (Id. at 218, 222.)  As before, her gait was normal, as was her back extension in abduction and adduction.  (Id. at 218.)

Also in December 2009, Plaintiff was evaluated by John Demorlis, M.D., at the request of the Phelps County Family Support Division.  (Id. at 225-31.)  Plaintiff described having pain in her mid-chest that spread across the chest and into her arms.  (Id. at 225.)  This pain occurs with exertion, for instance, when she vacuums or walks upstairs, and lasts approximately one hour.  (Id.)  She used to take "'Nitro,'" but let the pills expire.  (Id.)  She has back pain that is a five and began with a car accident thirty-two years earlier.  (Id.)  She has thyroid problems, and has gained sixty pounds.  (Id.)  She has hypertension, and has had since she was twenty years old.  (Id.)  It is controlled with medication.  (Id.)  She further reported that she can only walk a block before she begins sweating and experiencing chest and knee pain.  (Id. at 226.)  She has no problem standing or sitting.  (Id.)  She can lift

approximately twenty pounds.  (Id.)  Her three siblings all suffer from depression.  (Id.)  She

has been married and divorced three times; she has a son and a daughter, both are in good

health.  (Id.)  She smokes one and one-half to two packs of cigarettes a day, and has for

twenty years.  (Id.)  She has cut down on her smoking in the past six years. (Id.)  She was

fired from her job of ten and one-half years at Boys and Girls Town after complaining of the

conditions there.  (Id.)  She has been looking for a job ever since.  (Id.)  On examination, she

complained of a constant headache.  (Id. at 226.)  She moved around easily, wore a sad face,

was preoccupied, could do a full squat, had a normal gait, could walk on heels and toes, had

full grip strength, and had a normal range of motion in her shoulder, elbows, wrists, hips, and

cervical and lumbar spine.  (Id. at 227-28, 230-31.)  Dr. Demorlis opined that she was

capable of working.  (Id. at 228.)

In January 2010, a Psychiatric Review Technique form (PRTF) was completed for

Plaintiff by a non-examining consultant, Marc Maddox, Ph.D.  (Id. at 240-51.)  Plaintiff was

described as having an affective disorder, i.e., depression, and an anxiety disorder, neither

of which was severe.  (Id. at 240, 243, 244.)  These disorders resulted in Plaintiff

experiencing mild difficulties in maintaining concentration, persistence, or pace. (Id. at 248.)

She had no restrictions of activities of daily living and no difficulties in maintaining social

functioning.  (Id.)  She had not had any episodes of decompensation of extended duration.

(Id.)

That same month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Jennifer Dunlap, a single decision-maker.[18] (Id. at 252-59.) The primary diagnosis was coronary artery disease; the secondary diagnosis was hypothyroidism; another alleged impairment was morbid obesity. (Id. at 252.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day. (Id. at 253.) Her ability to push or pull was otherwise unlimited. (Id.) She had one postural limitation, i.e., she should only occasionally climb ladders, ropes, or scaffolds. (Id. at 254.) She had no manipulative, visual, or communicative limitations. (Id. at 255.) She had environmental limitations of needing to avoid concentrated exposure to extreme cold or heat. (Id. at 255-56.)

In May 2010, Dr. Gorrell completed a Medical Source Statement – Physical on Plaintiff's behalf, finding Plaintiff to be more limited than had Ms. Dunlap. (Id. at 267.) Specifically, Dr. Gorrell concluded that Plaintiff could frequently lift and carry five pounds; occasionally lift and carry ten pounds; continuously stand or walk for twenty minutes; stand or walk for a total of two hours throughout an eight-hour day; sit continuously for one hour; and sit for a total of four hours throughout an eight-hour. (Id. at 267.) Her ability to push and pull was limited because her arms fell asleep. (Id.) She could occasionally reach, handle, finger, and feel, but should never, climb, balance, stoop, kneel, crouch, or crawl. (Id.

---

[18]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

at 268.)  She should avoid any exposure to hazards and heights and avoid moderate exposure to extreme cold or heat, weather, wetness and humidity, dust, fumes, and vibrations.  (Id.) She had pain every hour that lasted fifteen to thirty minutes.  (Id.)  Dr. Gorrell noted Plaintiff's complaint that she was "'never pain free.'"  (Id.)  Percocet made Plaintiff sleepy. (Id.)

Plaintiff underwent another evaluation by Dr. Spencer in August 2010 "to assist in the determination of Medicaid eligibility."  (Id. at 484-87.)  Her chief complaints were of chronic pain caused by a car wreck and a back condition, severe depression, and heart problems.  (Id. at 484.)  She reported that she had experienced depression "'all [her] life'" and lacked motivation and energy.  (Id.)  Although she was tired, she did not sleep well.  (Id.)  She took eighty milligrams of Prozac, but remained depressed.  (Id.)  Her appetite was poor; however she had gained twenty pounds since she had last seen him.  (Id.)  He noted that she drank a twelve-pack of soda a day.  (Id.)  She forced herself to get out of bed in the morning and accomplish her activities of daily living.  (Id.)  She reported that she was homeless.  (Id.)  She was anhedonic.[19]  (Id.)  She felt like she was having a heart attack whenever she exerted herself; this feeling increased her panic.  (Id.)  She had not seen a qualified mental health professional since she had last been evaluated by Dr. Spencer.  (Id.)  Her gait was normal. (Id. at 485.)  Her son was helping her financially; she and her daughter were estranged.  (Id.) Her daily activities included making her bed, feeding "the animals,"  helping around the

---

[19]Anhedonia is the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable."  Stedman's Medical Dictionary, 90 (26th ed. 1995).

house, and helping with laundry and dishes.  (Id.)  Her speech was flat; her affect was bland;

her mood was "okay"; her insight and judgment were "fairly intact"; her flow of thought was

"intact and relevant,"  (Id. at 486.)  Dr. Spencer diagnosed her with major depressive

disorder, recurrent, moderate, and anxiety disorder, not otherwise specified (NOS).[20]  (Id. at

487.)  He assessed her GAF as 50 to 55.[21]  (Id.)  He concluded that she had a mental illness

which "interfere[d] with her ability to engage in employment suitable for her age, training,

experience, and/or education."  (Id.)  The duration could be expected to last at least twelve

months, "but with appropriate treatment and compliance," would likely improve.  (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had met the insured status requirements of the

Act through December 31, 2013, and had not engaged in substantial gainful activity since her

alleged onset date of August 11, 2009.  (Id. at 15.)  The ALJ next found that Plaintiff had

severe impairments of coronary artery disease, obesity, and a combination of depression and

anxiety.  (Id.)  Summarizing Plaintiff's medical records, the ALJ noted, among other things,

---

[20]According to the DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category.  DSM-IV-TR at 4.  This category may be used in one of four situations: (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class.  Id.

[21]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34 (emphasis omitted).  See note 10, supra, for a definition of a GAF between 51 and 60.

that she had not reported having any heart attacks after 2001; that she smoked before the last heart attack and continued to do despite having been advised to stop; that she "complain[ed] of a variety of problems, but rarely of any of the problems she reports in this proceeding"; and that she showed an abnormal mood and anxiety at her checkup in January 2010, but showed nothing physically abnormal. (Id. at 16-17.) She had high blood pressure and high lipids, both were controlled by medication. (Id. at 17.) The ALJ noted the discrepancies in Plaintiff's complaints to Dr. Spencer during her two examinations, including her chief complaints at the first visit of having lost her job and of a heart attack and at the second visit of chronic pain from a car accident thirty years earlier, back pain, depression, and heart problems. (Id.) At the time of the first visit, Plaintiff was living with her daughter; at the second visit, they were estranged. (Id.) Further noting that Plaintiff had made no complaint of mental health problems before being fired but had testified that she had been depressed her whole life, the ALJ concluded that "her depression and anxiety, in combination, [were] a severe impairment, though only by a de minimis standard." (Id.)

Plaintiff's various impairments did not, singly or in combination, meet or medically equal an impairment of listing-level severity. (Id. at 18.) Her depression and anxiety resulted in, at most, mild restrictions in her activities of daily living, mild difficulties in maintaining social function, and mild difficulties in maintaining concentration, persistence, and pace. (Id.) They did not result in any episodes of deterioration. (Id.) And, her "obesity [was] not itself a listed impairment." (Id.)

The ALJ next addressed the question of Plaintiff's RFC. (Id. at 18-20.) He concluded that she had the RFC to perform the exertional demands of light work, i.e., she could lift and carry twenty pounds occasionally and ten pounds frequently and could stand, walk, and sit for six hours with normal breaks in the usual work day. (Id. at 18.) She had an additional limitation of requiring a low stress work environment. (Id.) Her mental impairments had been classified by the non-examining consultant as not severe, indicating that there were no significant limitations caused by such. (Id.) The ALJ noted that Dr. Gorrell's assessment reflected that Plaintiff "could perform nearly the demands of sedentary work." (Id.) She had found that Plaintiff could not sit for six hours in the usual work day and needed to lie down during the day because of her pain. (Id. at 19.) The ALJ found that neither restriction was supported by the medical evidence. (Id.) Plaintiff had not reported neck, back, or shoulder pain until after filing her applications and had attributed the pain to a car accident thirty years earlier. (Id.) Although she had also reported that the pain had intensified in the past few years, she had not complained of such to her primary care physician until after applying for disability. (Id.) There were no imaging studies of her neck, shoulder, or back, and Dr. Brewer's observations were only of a limited range of motion. (Id.) There was also no medical evidence supporting her "reports of mentally based symptoms." (Id. at 20.) The ALJ found that Plaintiff's descriptions of her symptoms and the limitations caused thereby were not credible to the extent they were inconsistent with his RFC assessment. (Id.)

With her RFC, Plaintiff could not return to her past relevant work. (Id.) However, given her age, education, work, experience, and RFC, she could perform the jobs described

by the VE.  (Id. at 20-21.)  She was not, therefore, disabled within the meaning of the Act. (Id. at 21-22.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a

severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.1520(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'"  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'"  **Id.** (quoting Polaski, 739 F.2d at 1322).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'"  **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on

hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's

decision.'"  **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).  <u>See also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred (1) in determining her RFC because he improperly rejected the opinions of Drs. Gorrell and Spencer and mistakenly relied instead on the opinion of Dr. Oguejiofor; (2) by not specifying how and why he concluded she needed a low-stress environment; and (3) by not considering the impact of her obesity on her ability to work.  The Commissioner disagrees.

<u>Drs. Gorrell and Spencer.</u>   In May 2010, Dr. Gorrell concluded that Plaintiff could frequently lift and carry five pounds; occasionally lift and carry ten pounds; continuously stand or walk for twenty minutes; stand or walk for a total of two hours throughout an eight-hour day; sit continuously for one hour; and sit for a total of four hours throughout an eight-hour.[22]  The ALJ discounted this opinion based, in part, on a finding that Plaintiff had not reported having neck, back, or shoulder pain until after filing for disability and, when finally reporting it, had attributed the pain to an accident that had occurred thirty years earlier. Plaintiff argues that this finding is not supported by the record.  It is.

---

[22]Other, non-exertional limitations found by Dr. Gorrell, e.g., avoiding exposure to hazards, are not at issue.

Contrary to Plaintiff's argument, she was not diagnosed in January 2001 with chronic neck pain. Rather, when hospitalized that month for chest pains, it was noted that her past medical history included chronic neck pain. This history was based on Plaintiff's report, not on any contemporaneous complaint of such pain. Her diagnoses on discharge from the hospital did not include any reference to neck pain. Similarly, Plaintiff was not diagnosed the following month with chronic neck pain, as she argues. As before, the record of the same hospital which had treated her the month before includes "chronic neck pain" in her *past* medical history. Nor was there any reference to her complaining of currently experiencing any neck pain. And, as noted by Plaintiff, the references in her June 2007 and March 2008 records list a *history* of chronic back pain. Plaintiff emphasizes the results of the January 2005 x-ray revealing degenerative changes of her cervical spine, which had worsened since October 2002. There are no records, however, of any visits to any health care providers around the time of the January 2005 x-ray, including any visits occasioned by complaints of neck pain. Nor are the referred-to October 2002 x-rays in the record; thus, "worsened" could refer to a deterioration from "minimal" to "small."

Plaintiff first saw Dr. Gorrell in June 2007 for complaints of dizziness. She next saw her in September 2008 for flu, thyroid issues, and constipation. Five months later, she again consulted Dr. Gorrell for complaints unrelated to those now at issue. Plaintiff first complained to Dr. Gorrell about her two allegedly disabling impairments – anxiety attacks and back pain – three days after her alleged disability onset date, which is the same day she was fired from her job. Dr. Gorrell noted that she had applied for disability. Another five

months passed before Plaintiff returned to Dr. Gorrell, reporting that her antidepressant, Prozac, was not working. When Plaintiff next saw Dr. Gorrell, she requested that she complete paperwork for her appeal from the denial of her DIB and SSI applications. She told Dr. Gorrell that she could not work due to depression and pain. The paperwork completed by Dr. Gorrell included limitations that would preclude work, but which have no support in the record, including Dr. Gorrell's own treatment notes, other than Plaintiff's subjective complaints. For instance, Dr. Gorrell reported that Plaintiff had pain every hour that lasted between fifteen to twenty minutes.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)[23]) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201

---

[23]See note 24, infra.

F.3d 1010, 1013-14 (8th Cir.2000)). See also 20 C.F.R. §§ 404.1527(d), 416.927(d)[24] (listing six factors to be evaluated when weighing opinions of treating physicians, including supportability and consistency). And, "[i]t is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson**, 578 F.3d at 843, or when it consists of conclusory statements, **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). See also **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

In the instant case, contrary to Plaintiff's arguments, Plaintiff first complained to Dr. Gorrell of back and knee pain and of anxiety after applying for disability. Two visits later, she requested that Dr. Gorrell complete paperwork in support of her appeal from the denial of her applications. The treatment notes, all in a checklist format, of those three visits do not support the limitations Dr. Gorrell described on the Medical Source Statement – Physical. Indeed, Dr. Gorrell's incorporation in that statement of Plaintiff's subjective complaints is clear from the reference in the treatment notes of the corresponding visit to Plaintiff stating that she could not work due to depression and pain. A checklist format and conclusory

_____

[24]Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2010 version of the Regulations in effect when the ALJ rendered his adverse decision. The Regulations's most recent amendment, effective March 26, 2012, reorganizes the relevant subparagraphs but does not change their substance.

opinions, even of a treating physician, are of limited evidentiary value.  **Wildman**, 596 F.3d at 964; **Wiese**, 552 F.3d at 732.  In **Wildman**, the Eighth Circuit held that the ALJ had properly discounted a treating physician's assessment as conclusory when that "opinion consist[ed] of three checklist forms, cite[d] no medical evidence, and provide[d] little to no elaboration."  596 F.3d at 964.  And, in **Teague v. Astrue**, 638 F.3d 611 (8th Cir. 2011), as in the instant case, the treating physician's "'check-off form'" medical source statement was "procured and submitted by counsel after the initial denial of benefits" and "provided the only direct evidence of functional limitations tied to [the claimant's cited impairment]."  **Id.** at 615.  The statement did not cite any clinical tests results or findings and was inconsistent with the physician's previous treatment notes.  **Id.**  The court held that the ALJ had not erred by not giving it any weight.  **Id.**

Plaintiff further argues that the ALJ erred by not giving the proper weight to the second opinion of Dr. Spencer.  As noted by both Plaintiff and the ALJ, Dr. Spencer's opinion about the impact of Plaintiff's mental illness on her ability to work changed in the ten-month interim between his two evaluations.  The earlier opinion was that such illness did not interfere.  When being evaluated the second time, Plaintiff was then homeless, had not seen a mental health specialist, and was estranged from her daughter.  Dr. Spencer diagnosed Plaintiff with major depressive disorder, recurrent, moderate, and anxiety disorder, NOS.  Plaintiff informed Dr. Spencer and so testified one month later, however, that she had been depressed her whole life. Yet, she had been gainfully employed until being fired in August 2009.  Dr. Spencer also opined that Plaintiff, who had had no mental health treatment, would improve with such

treatment. Plaintiff testified at the administrative hearing one month later that she had recently obtained insurance coverage under Medicaid and going to see such treatment.

A consulting medical examiner's opinion is not entitled to special deference, particularly when it is primarily based on the claimant's subjective complaints. See **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007). The ALJ's failure to give Dr. Spencer's second opinion such deference is also supported by his reference to a mental illness which Plaintiff described as having her whole life and by his reference to the illness improving with treatment, which Plaintiff testified she was going to seek.

Because the ALJ did not err when assessing the opinions of Drs. Gorrell and Spencer, his failure to include their respective findings in questions posed to Dr. Oguejiofor was also not in error.

Mental Impairment. The ALJ found that Plaintiff's combined depression and anxiety was a severe impairment. Plaintiff contends that the ALJ erred by not finding any specific workplace restrictions caused by this impairment.

Social Security Ruling 85-15, 1985 WL 56857, *5-6 (S.S.A. 1985), requires that an ALJ consider whether a claimant with a mental illness can adapt to the stress of the workplace. In **Brosnahan v. Barnhart**, 336 F.3d 671 (8th Cir. 2003), the court affirmed an ALJ's finding that a claimant who suffered from depression resulting in slight limitations in daily activities and social functioning and in frequent deficiencies in concentration, persistence, and pace had the RFC for performing light work with the additional restriction of being limited to following simple instructions and working in a low-stress environment.

**Id.** at 675.  See also **Fastner v. Barnhart**, 324 F.3d 981, 984-85 (8th Cir. 2003) (similar holding as to RFC of claimant with severe impairment of, among others, anxiety).

Plaintiff does not dispute that the ALJ's findings of mild impairments in mental functioning are consistent with a low-stress work environment.  Rather, she argues that the ALJ did not specify that his requirement of a low-stress environment resulted from her mental impairment and not from her coronary artery disease and history of heart attacks.  There is nothing in the record to suggest that Plaintiff's coronary artery disease and history of heart attacks required a low-stress environment.  There are no medical records of Plaintiff needing treatment for heart-related problems two years before she was fired from her high-stress job.[25] Indeed, four months after that, she informed a doctor that she had let her prescription for heart medication, "Nitro," expired.  Thus, a careful reading of the ALJ's decision reveals that the requirement of a low-stress work environment was because of her depression and anxiety. Any failure of the ALJ to not explicitly tie the requirement to Plaintiff's mental impairment has no bearing on the adverse outcome, which as explained elsewhere in this Report and Recommendation, is supported by substantial evidence on the record as a whole.  See **Hepp v. Astrue**, 511 F.3d 798, 806 (8th Cir. 2008) ("[A]n arguable deficiency in opinion-writing technique does not require [the Court] to set aside an administrative finding when that deficiency had no bearing on the outcome.") (internal quotations omitted).

---

[25] The Court notes that Plaintiff had a cardiac consultation with Dr. Lehman two months before her job ended.  There was no evidence of active disease at that time, nor was any treatment suggested other than a continuation of her current treatment.

Obesity.  The ALJ found Plaintiff's obesity to be a severe impairment, but not a listed impairment.  Plaintiff argues that the ALJ fatally failed to assess the impact of her obesity on her ability to work.

Obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."  Social Security Ruling 02-01p, 2000 WL 628049, *4 (S.S.A. 2002).  According to the regulations,

> [o]besity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpart P, Appx. 1, § 1.00(Q).

In the instant case, Plaintiff did not cite obesity as a disabling condition on her applications, on forms she completed, including the Disability Report she completed pursuant to her applications or in her testimony.  In **McNamara v. Astrue**, 590 F.3d 607, 611 (8th Cir. 2010), the Eighth Circuit rejected an argument that the ALJ had erred by failing to discuss in her decision the claimant's obesity "as a potential work-related limitation."  The court noted that no physician had "ever placed physical limitations on [the claimant's] ability to perform work-related functions because of her obesity."  **Id.**  Nor had she described such in an application report or in her testimony.  **Id.**

As noted in Social Security Ruling 02-1p, obesity can complicate chronic diseases of the musculoskeletal body systems, increase the risk of developing hypertension, and cause or contribute to depression. Social Security Ruling 02-01p, 2000 WL 628049 at *3. The ALJ evaluated Plaintiff's complaints, and found she had severe impairments of coronary artery disease, obesity, and a combination of depression and anxiety. The ALJ further found that Plaintiff's severe impairments, including obesity, did not singly or in combination, meet or medically equal an impairment of listing-level severity. The Eighth Circuit Court of Appeals has "held that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal." **Heino v. Astrue**, 578 F.3d 873, 881 (8th Cir. 2009) (citing Brown ex rel. Williams v. Barnhart, 388 F.3d 1150, 1153 (8th Cir. 2004)). See also **Green v. Astrue**, 2011 WL 749743, *20-21 (E.D. Mo. Feb. 23, 2011) (finding that ALJ properly considered claimant's obesity by considering all her medical records and symptoms in light of obesity and concluding that impairments did not meet requirements of listing).

Plaintiff lists several restrictions, e.g., insomnia and limited abilities to sit, stand, and walk, that she argues have a greater combined effect because of her obesity. The merit of this argument depends on the credibility of her descriptions of her limited abilities. The ALJ, however, found those descriptions not to be credible insofar as they were inconsistent with his RFC findings. His credibility determination is not challenged by Plaintiff.

For the foregoing reasons, the ALJ properly considered the effect of Plaintiff's severe impairment of obesity on her RFC.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman**, 596 F.3d at 964. Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  10th  day of June, 2013.